OPINION
{¶ 1} Defendant-appellant, Mountain Agency, LLC, appeals a decision of the Clermont County Court of Common Pleas granting a permanent injunction to plaintiff-appellee, 1st National Bank, in a dispute over an easement. For the reasons outlined below, we affirm in part, reverse in part, and remand.
 {¶ 2} In December 1975, J. and C. Agency, Inc. ("J.C.A.") purchased approximately 17 acres of real property located in Union Township, Clermont County, *Page 2 
Ohio. At that time, J.C.A. president Jeffrey L. Wyler sold a 0.9414-acre portion of this 17 acres to Mt. Lookout Savings and Loan Company ("Mt. Lookout"). The limited warranty deed conveying the 0.9414-acre tract contained an easement for ingress and egress for the benefit of the grantee over J.C.A.'s property. The deed specified that the easement, which was approximately 271 feet long (the width of Mt. Lookout's lot) and 60 feet wide, was to be used "for roadway purposes only." This, in effect, created a private access road running parallel to Route 32 for use by Wyler and Mt. Lookout. The deed also authorized the grantee to erect an advertising sign in the easement. Subsequent to purchasing the property, Mt. Lookout constructed a building on the tract which remains on the property today.
 {¶ 3} The 0.9414-acre tract eventually passed to Clermont Savings Bank ("Clermont Savings"). In March 1992, Clermont Savings conveyed the tract to 1st National Bank ("1st National" or "the bank") by general warranty deed.[1] The March 1992 deed contained an easement for ingress, egress, and signage over J.C.A.'s property, referencing the original easement in the December 1975 deed. J.C.A. eventually transferred the remainder of its 17-acre tract to appellant, Jeff Wyler subsidiary Mountain Agency, LLC ("Wyler").
 {¶ 4} In 1992, when 1st National purchased the property, its customers could enter the property by one of three routes: (1) through the rear entrance to the bank off Elick Lane;[2] (2) through the front entrance to the bank off the east end of the easement *Page 3 
at Elick Lane; or (3) by way of Glen Willow Lake Lane, [3] driving over Wyler's property and then through the west end of the easement. The same routes were available to exit the property. In order to exit the property through the rear entrance off Elick Lane, customers drove into the easement by way of one of the bank's two driveways leading into the easement, performed a u-turn in the easement, and re-entered the bank's property by way of the other driveway leading from the easement to the bank's property.
 {¶ 5} The present dispute arose when Wyler began parking dealership vehicles in the easement for display purposes. At first, Wyler parked vehicles on the north side of the easement and along portions of the south side. This hindered the ability of 1st National's customers to negotiate a u-turn in the easement to exit through the bank's rear drive. In the year 2000, the county totally rebuilt the intersection at Elick Lane and Route 32 and cut off access from Elick Lane to the east end of the easement, creating a cul-de-sac at that end of the easement. This made the rear entrance off of Elick Lane the new main entrance for the bank. Wyler then began parking vehicles along the north, south, and east ends of the easement. Although the vehicles did not block the bank's two driveways leading to the easement, the placement of the vehicles hindered the ability of bank customers to perform a u-turn in the easement.
 {¶ 6} After the east end of the easement was closed, Wyler customers and transport trucks began using 1st National's driveway and parking lot to access the Wyler property through the west end of the easement. Attorney Paul Herdman, chairman of the board and majority owner of 1st National, testified that transport trucks struck the bank building on more than one occasion. In order to prevent Wyler customers and *Page 4 
transport trucks from entering its property, 1st National placed mounds of fill dirt on the two driveways leading from the bank to the easement. This completely blocked access to the easement from the bank property. The record is unclear as to when this action was taken, but it appears that the timeframe was sometime between the years 2000 and 2002.
 {¶ 7} Once 1st National deposited the fill dirt, bank customers could only enter and exit the property through the main entrance off Elick Lane. Because customers could no longer perform a u-turn in the easement, 1st National altered its property so that customers using the bank's drive-through lanes could negotiate a tight u-turn on the bank's property in order to exit. Soon after the fill dirt was placed, Wyler began parking display vehicles across the width of the two blocked driveways as well.
 {¶ 8} Aerial and ground photographs entered into evidence depict the easement area in its current condition. The photographs show 1st National's driveways filled in, and Wyler vehicles parked the entire length of the easement. This includes the northern, southern, and eastern ends of the easement. The western end of the easement opens to the Wyler dealership. The photographs also demonstrate that Wyler has demarcated parking spaces along the northern and southern ends of the easement.
 {¶ 9} On July 25, 2006, 1st National filed a complaint seeking a permanent injunction prohibiting Wyler from parking its vehicles on, or otherwise obstructing, the easement. On May 7, 2008, following a bench trial, the trial court issued its decision in favor of 1st National. The trial court's order permanently enjoined Wyler from parking, storing, or exhibiting for sale any vehicles or other items of personal property on the land subject to the easement or placing any obstructions thereon. Wyler timely appeals, raising four assignments of error. *Page 5 
 {¶ 10} Assignment of Error No. 1:
 {¶ 11} "THE TRIAL COURT'S CONCLUSION THAT WYLER WAS INTERFERING WITH THE BANK'S USE OF THE EASEMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 12} Wyler argues that it did not use its property in any way that interfered with the easement, and that it began parking vehicles along the length of the easement only after 1st National filled in the two driveways leading from its property to the easement. Wyler further maintains that the trial court improperly concluded that Wyler was not permitted to park cars for display in the easement area.
 {¶ 13} An appellate court will not reverse a judgment as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case. C.E. Morris Co. v. Foley Const. Co. (1978), 54 Ohio St.2d 279, syllabus. Because the trial court is in the best position to weigh the testimony and observe the witnesses' demeanor in order to gauge their credibility, this court must not substitute its judgment for that of the trial court when there is competent and credible evidence supporting the trial court's findings of fact and conclusions of law. Seasons Coal Co.,Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 14} An easement is defined as "a right, without profit, created by grant or prescription, which the owner of one estate, called the dominant estate, may exercise in or over the estate of another, called the servient estate, for the benefit of the former." Proffitt v.Plymesser (June 25, 2001), Brown App. No. CA2000-04-008, at 2-3, quotingTrattar v. Rausch (1950), 154 Ohio St. 286, paragraph one of the syllabus. An easement may be acquired by express grant, by implication, or by prescription. Trattar at paragraph two of the syllabus. The owner of the servient estate may use his property in any manner that is not inconsistent with the limited use allocated to the owner of the *Page 6 
dominant estate. Paulson v. Vanlandingham (Feb. 12, 1996), Clermont App. No. CA95-07-045, at 4.
 {¶ 15} The first issue raised by Wyler is whether the trial court improperly concluded that Wyler interfered with 1st National's use of the easement. According to Wyler, the evidence demonstrates that bank customers were able to freely travel through the easement before1st National filled in the two driveways leading from the bank property to the easement. Wyler emphasizes that it began parking display vehicles along the entire length of the easement only after 1st National filled in these driveways.
 {¶ 16} At trial, 1st National board chairman Herdman testified that he complained to Mr. Wyler when Wyler customers and transport trucks began crossing the bank's property to access the Wyler dealership. Both Herdman and Jillora Summers, 1st National president and general counsel, testified that 1st National customers could not use the easement after Wyler began parking cars in it.
 {¶ 17} The trial court further considered the testimony of B. Robert Harlow, executive vice president of 1st National. Harlow had also been employed by 1st National's predecessor in interest, Clermont Savings. Harlow testified that Clermont Savings would call Wyler when cars were parked in the easement, and Wyler would remove the cars. Wyler did not necessarily remove all the cars from the easement, but enough, in Harlow's estimation, "that it didn't bother the bank." This reoccurred several times, according to Harlow. Wyler vehicles would slowly creep back into the easement, Clermont Savings would call Wyler, and the vehicles would be removed. As stated, current aerial and ground photographs show Wyler vehicles parked the entire length of the easement and parking spaces marked along the northern and southern ends of the easement.
 {¶ 18} Wyler vice president Roger Rice was the sole witness who testified for *Page 7 
Wyler at trial. Rice claimed that he was unaware of any complaints made by Clermont Savings or 1st National about Wyler vehicles in the easement. To Rice's knowledge, Wyler never moved the cars out of the easement at the request of Clermont Savings or 1st National. In fact, when cars were parked along the south side of the easement, Rice maintained that he, on his own, would tell the sales manager to move them. Rice also stated that he asked a 1st National employee whether Wyler could park cars in the easement after the bank filled in its two driveways. According to Rice, the employee responded that she did not think it would be a problem. Rice also claimed to be totally unaware of any transport vehicles damaging 1st National's building.
 {¶ 19} Although Rice's testimony conflicts with that given by Herdman, Summers, and Harlow, the trial court was in the best position to observe the witnesses and adjudge their credibility. Seasons Coal,10 Ohio St.3d at 80. After reviewing the record, we find that there was competent, credible evidence supporting the trial court's conclusion that Wyler was interfering with the bank's use of the easement. Even prior to 1st National filling in the driveways, it is apparent from the photographs that bank customers would have a difficult time negotiating a u-turn in the easement when Wyler vehicles were parked along the length of the easement (excluding the driveway entrances). The fact that some space remained for bank customers to perform a u-turn was irrelevant, as Wyler's actions effectively decreased the size of the easement as it was delineated in the granting instrument. Cf. Goldberger v. BexleyProperties (1983), 5 Ohio St.3d 82, 85.
 {¶ 20} The second issue raised by Wyler is whether the trial court incorrectly concluded that Wyler was restricted from parking cars in the easement because such an act was not permitted by the granting instrument. As stated, the original easement in the December 1975 deed, to which the March 1992 deed referred, specified that the *Page 8 
easement was to be used "for roadway purposes only." Wyler insists that this restriction was to be imposed on the grantee only, not on the grantor.
 {¶ 21} A close reading of the trial court's decision reveals that, contrary to Wyler's assertion, the court did not actually impose the restriction that the easement be used "for roadway purposes only" upon Wyler. Rather, the court held that 1st National was entitled to full use of the entire easement and that Wyler could not interfere with 1st National's full use of the easement by using the area as a parking lot. This holding accords with the long-established rule that the owner of a servient estate may use his or her property for any purpose that doesnot interfere with the easement. See Paulson, Clermont App. No. CA95-07-045 at 4.
 {¶ 22} The trial court held that "Wyler's use of the easement area as a parking lot essentially abrogates [1st National's] ability to use the easement for roadway purposes * * *." (Emphasis added.) The trial court found that Wyler was permitted to park its cars next to the easement area, but may not interfere with the 271 foot by 60 foot easement granted to 1st National. Holding that Wyler may not interfere with 1st National's use of the easement for roadway purposes is not the same thing as imposing the restriction that the easement be used "for roadway purposes only" upon Wyler.
 {¶ 23} We conclude that the trial court's determ ination that Wyler was interfering with 1st National's use of the easement was supported by competent, credible evidence and therefore was not against the manifest weight of the evidence. Seasons Coal at 80.
 {¶ 24} Wyler's first assignment of error is overruled.
 {¶ 25} Assignment of Error No. 2:
 {¶ 26} "THE TRIAL COURT ERRED IN FINDING THAT THE BANK DID NOT ABANDON THE EASEMENT." *Page 9 
 {¶ 27} Wyler contends that the evidence establishes 1 st National abandoned the easement. It is undisputed that 1st National has not used the easement since covering the driveways leading to the easement with fill dirt. Wyler maintains that 1st National's intent to abandon the easement was evinced by its modification of its property to permit bank customers sufficient room to enter and exit the property without using the easement.
 {¶ 28} In order to show that an easement was terminated by abandonment, the owner of the servient estate must prove both nonuse and an affirmative intent to abandon the easement on the part of the owner of the dominant estate. Harvest Land Co-Op, Inc. v. Sandlin, Butler App. No. CA2005-08-360, 2006-Ohio-4207, ¶ 15. The intent to abandon the easement must be proven by "unequivocal and decisive acts" by the owner of the dominant estate which are inconsistent with future use and enjoyment of the easement. Warner v. Thompson (Sept. 27, 1993), Fayette App. No. CA93-02-002, at 4. Mere nonuse of an express easement, without more, does not give rise to an inference of abandonment. Langhorst v.Riethmiller (1977), 52 Ohio App.2d 137, 140-41.
 {¶ 29} As stated, the first element of abandonment, nonuse, is undisputed. Wyler thus had to prove that 1st National demonstrated an affirmative intent to abandon the easement. Wyler correctly asserts that 1st National modified its property so bank customers could enter and exit without using the easement. 1st National placed gravel on a portion of its property near the drive-through lanes to permit customers to turn around on the bank's property, instead of in the easement, after using the drive-through. Summers testified that 1st National was forced to provide this alternative after it became impossible to perform a u-turn in the easement. She also maintained that it was an awkward u-turn, an assertion that is supported by the aerial photograph of the *Page 10 
area. In addition, the placement of gravel on the bank's property indicates a temporary, rather than permanent, alternative to using the easement to facilitate egress from 1st National's property.
 {¶ 30} Similarly, Summers and Herdman both testified that 1st National implemented a temporary measure to block off the two driveways leading from the bank's property to the easement. In placing dirt over the driveways, they were blocked but not destroyed. The fill dirt was placed directly on top of the asphalt so that the driveways beneath were preserved. In order to restore the driveways, the dirt simply need be removed. Such a relatively minor and impermanent obstruction does not amount to an "unequivocal and decisive act" which is inconsistent with future use and enjoyment of the easement. Warner at 4.
 {¶ 31} Moreover, courts have refused to find abandonment where more significant obstructions were implemented than in the case at bar. For example, the Eleventh District Court of Appeals addressed allegations that an easement was abandoned in Lone Star Steakhouse Saloon of Ohio,Inc. v. Ryska, Lake App. No. 2003-L-192, 2005-Ohio-3398. The express easement in that case was created in 1980, but had never been used prior to the 2002 trial. The easement was partially obstructed by trees that were planted and cement parking abutments that were placed in the easement. The appellate court found that the non-use and these "minor obstructions" were insufficient to demonstrate a clear intent to abandon the easement on the part of the dominant estate holder. Id. at ¶ 59.
 {¶ 32} Summers and Herdman both testified that one reason for blocking the easement was to prevent Wyler customers and transport trucks from traversing the bank's property to access the Wyler dealership. The placement of the fill dirt amounted to a short-term solution to the problem, which Herdman anticipated would eventually be *Page 11 
resolved by settlement or by lawsuit. This is consistent with 1 st National's assertion that it did not intend to abandon the easement.
 {¶ 33} We conclude that the trial court did not err in finding that 1st National did not abandon the easement.
 {¶ 34} Wyler's second assignment of error is overruled.
 {¶ 35} Assignment of Error No. 3:
 {¶ 36} "THE TRIAL COURT ERRED IN FINDING THAT THE EASEMENT WAS NOT TERMINATED BY THE COMPLETION OF THE PURPOSE OR NECESSITY FOR WHICH THE EASEMENT WAS CREATED."
 {¶ 37} Wyler asserts that the easement was terminated by completion of the purpose for which it was created. While not conceding that the purpose of the easement was for 1st National's customers to perform a u-turn, Wyler claims that this purpose was terminated when 1st National blocked its two driveways leading to the easement. Wyler further contends that the easement was terminated by a change in the use of 1st National's property, which no longer operates as a bank.
 {¶ 38} Aside from abandonment, an express easement may also be terminated by the completion of the purpose or necessity for which it was created, or a change in the character or use of the property.Siferd v. Stambor (1966), 5 Ohio App.2d 79, 87. See, also, Grau v.Burlington Group, Inc. (Jan. 26, 1996), Geauga App. No. 94-G-1870,1996 WL 200571 at *4.
 {¶ 39} According to the March 1992 deed, the purpose of easement was for ingress and egress. The trial court's decision granting a permanent injunction to 1st National found that the easement did not encompass the entire access road from Elick Lane to Glen Willow Lake Lane. This ruling is not challenged on appeal. Accordingly, the west end of the easement is not available as a point of ingress or egress for bank *Page 12 
customers. When the county cut off access from Elick Lane to the east end of the easement, this severed another point of ingress and egress. In effect, the access road purpose for which the easement was created was partially extinguished by the creation of the cul-de-sac at the east end of the easement.
 {¶ 40} Although the western and eastern points of the easement are not available for ingress and egress, the purpose of the easement retains viability. The easement is still available to facilitate 1st National's customers in making a u-turn for egress from the bank's property. The fill dirt need only be removed from the driveways, and the driveways need be sufficiently clear of obstruction by Wyler vehicles, in order for 1st National's customers to perform a u-turn in the easement to exit at the new main entrance of the bank's property. Thus, the easement can still serve the purpose for which it was created.
 {¶ 41} Wyler correctly notes that 1st National no longer occupies the building on the property. Evidence in the record demonstrates that 1st National has not occupied the property in the two years preceding the trial. At present, 1st National leases the premises to rental car company Hertz. However, the easement was not made contingent upon the existence of a building on the dominant estate, much less upon that building being used as a bank. Lucked Out, Inc. v. The Cleveland Depo,Inc. (May 15, 1980), Cuyahoga App. No. 40999, 1980 WL 354803 at *2. See, also, Montlack Realty Co. v. Weber (Mar. 5, 1992), Cuyahoga App. No. 59974, 1992 WL 41844 at *2. In fact, at the time the easement was created in the December 1975 deed, there was not yet a structure on the property. Regardless of the use to which the building on the dominant estate is put, the easement is available for occupants or patrons to perform a u-turn to exit through the new main entrance of the property.
 {¶ 42} We conclude that, with the closing of Elick Lane, the purpose for which the *Page 13 
easement was created was partially extinguished by the creation of the cul-de-sac at the east end of the easement. Because the easement is still available for occupants or patrons of the dominant estate to perform a u-turn to exit through the new main entrance of the property, the easement still serves the purpose of egress and was not completely terminated.
 {¶ 43} Wyler's third assignment of error is sustained in part and overruled in part.
 {¶ 44} Assignment of Error No. 4:
 {¶ 45} "THE TRIAL COURT ERRED BY GRANTING BANK A PERMANENT INJUNCTION PROHIBITING WYLER FROM USING ITS PROPERTY."
 {¶ 46} Wyler argues that the evidence does not support that 1st National would suffer irreparable harm as a result of Wyler parking display vehicles in the easement. Rather, Wyler insists, 1st National could still use the easement if it so chose. The fact of 1st National's nonuse of the easement over the past several years, according to Wyler, demonstrates that 1st National suffered no harm, much less irreparable harm, from Wyler's use of the easement as a parking area.
 {¶ 47} Injunctive relief is an equitable remedy that is available only where there is no adequate remedy at law. Haig v. Ohio State Bd. ofEdn. (1992), 62 Ohio St.3d 507, 510. In order to obtain a permanent injunction, a party must show by clear and convincing evidence that immediate and irreparable injury, loss, or damage will result to the applicant and that there is no adequate remedy at law. Procter GambleCo. v. Stoneham (2000), 140 Ohio App.3d 260, 267-68. Irreparable harm is an injury for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete. DK Prods., Inc. v. Miller, Warren App. No. CA2008-05-060,2009-Ohio-436, ¶ 13.
 {¶ 48} The decision to grant or deny an injunction is within the sound discretion of *Page 14 
the trial court and will not be disturbed on appeal absent an abuse of discretion. Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt.Dist., 73 Ohio St.3d 590, 1995-Ohio-301, paragraph three of the syllabus. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 49} The Ohio Supreme Court has consistently held that injunctive relief is the proper mode of enforcing an express easement against an unwarranted interference or obstruction by the servient estate holder.Goldberger, 5 Ohio St.3d at 84. While we do not find that injunctive relief was inappropriate in the case at bar, it appears that the scope of the injunction was too broad in light of the partial termination of the easement by completion of its purpose.
 {¶ 50} The injunction crafted by the trial court prohibits Wyler from parking its vehicles in any portion of the easement. As stated, the eastern and western points of the easement are no longer available for ingress or egress. Under the facts at present, then, the entirety of the 271 foot by 60 foot easement is no longer needed to achieve the remaining purpose, which is for bank customers to make a u-turn in order to access the sole remaining egress point at the new main entrance to the bank's property.
 {¶ 51} We conclude that the trial court abused its discretion in permanently enjoining Wyler from parking vehicles in any portion of the easement. Danis Clarkco Landfill Co. at paragraph three of the syllabus. It is within the province of the trial court, as the finder of fact, to determine what portion of the easement must be preserved in order to facilitate the performance of u-turns in the easement by bank customers in order to exit 1st National's property. The trial court's overbroad injunction must be narrowed to comport with this remaining purpose.
 {¶ 52} Wyler's fourth assignment of error is sustained in part and overruled in *Page 15 
part.
 {¶ 53} The portion of the trial court's decision permanently enjoining Wyler from parking, storing, or exhibiting any vehicles or other items of personal property on the entirety of the easement is reversed. The remainder of the trial court's decision is affirmed.
 {¶ 54} On remand, the trial court is instructed to determine what precise portion of the easement must remain free from obstruction by Wyler in order to fulfill the remaining purpose of the easement, which is for 1st National customers to perform a u-turn in the easement in order to facilitate egress from the bank's property. This constitutes the sole remaining purpose of the easement in view of the county's closure of the eastern portion of the easement and in light of the trial court's ruling that the west end of the easement does not extend over Wyler's property to Glenn Willow Lake Lane.
 {¶ 55} Judgment affirmed in part, reversed in part, and remanded.
BRESSLER, P.J., and POWELL, J., concur.
[1] Although the subject property is still owned by 1st National, the building on the property is no longer used by the bank. Rather, the building is currently leased to Hertz, a rental car company. For purposes of this appeal, the property will be referred to as if it were still occupied by its owner, 1st National.
[2] Elick Lane runs north and south, and lies adjacent to the eastern side of 1st National's property.
[3] Glen Willow Lake Lane runs north and south, and lies just over 1,000 feet to the west of 1st National's property, just past the Wyler lot. The easement in question runs east and west, and lies to the north of 1st National's property. *Page 1